**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | | |
|---|---|---|
| **Eddie Ashley,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil No. 7:07-cv-177(HL)** |
| | : | |
| **Sheriff RICHARD CHAFIN, in His** | : | |
| **Official Capicity as Sheriff of Brooks** | : | |
| **County, Georgia,** | : | |
| | : | |
| **Defendants.** | : | |

## <u>ORDER</u>

This matter is before the Court on Defendants' Motion to Dismiss the Brooks County Sheriff's Office (Doc. 18-3), Defendants' Motion for Summary Judgment on all three claims (Doc. 18-3), and Defendants' Motion to bar Section 1983 monetary damages (Doc. 18-3).

After review of the motions and briefs, the pleadings and discovery materials on file, and the relevant case law, the Court grants Defendants' Motion to Dismiss. The Court grants the Defendants' Motion for Summary Judgment on the Title VII Disparate Treatment Claim, but the Court denies Summary Judgment on the Title VII Failure to Accommodate and Section 1983 Claims.  The Court also grants Defendants' motion to bar any potential Section 1983 monetary damages.

I.    **BACKGROUND**

This is an employment discrimination case arising from Defendants' refusal to allow Plaintiff to observe his Sabbath on Saturdays.  The facts viewed in the light most favorable to Plaintiff as the non-moving party are as follows:

Plaintiff, Mr. Eddie Ashley, has been an active member of the Seventh-day Adventist Church (the "Church") since 1965. (Ashley Dep. at 10.)  Among the tenets of the church is one that forbids the Church's adherents to work on the Sabbath, defined as sunset on Friday through sunset on Saturday. (Ashley Dep. at 50.) Ashley alleges he has observed this practice since 1965 with no exceptions. (Ashley Dep. at 51.)

In 1986, Ashley applied for and was offered a position as a detention officer with the Brooks County Sheriff's Office. (Ashley Dep. at 48.)  Ashley accepted  with the agreement that his Sabbath tenet would be accommodated. (Ashley Dep. at 50-51.)

During his nineteen year tenure as a Brooks County Detention Officer, Ashley only had two scheduling conflicts. (Ashley Dep. at 63-64.)  The first conflict, in 2002, was resolved when Ashley informed the new jail administrator about his religious conflict. (Ashley Dep. at 64.)  Ashley was unable to resolve the second conflict, which occurred on March 5, 2005, and this ultimately lead to Ashley's termination and this dispute. (Ashley Dep. at 55 & 64.)

2

The Sheriff's Office opened a new jail facility in February 2005. (Chafin Dep. at 25.)  Whereas the former jail facility housed approximately 90 inmates, the new facility holds between holding 60-80 inmates. (Chafin Dep. at 25.)  Additionally, whereas the former facility employed 8-9 people, the new facility employs 20-22 jail officers and administrative staff. (Chafin Dep. at 24 & 27.)

In addition to these changes, the new jail facility requires stricter policies and procedures than the former facility for its employees to ensure the health, safety, and welfare for the inmates and residents of Brooks County. (Chafin Dep. at 41-42; DMSJ at 2.)  According to Sheriff Chafin, allowing employees to swap schedules "would have been scrutinized and looked at a lot closer under the new rules and under the new facility, but I can't rule out the fact that I would not have done that had [Ashley] found somebody." (Chafin Dep. at 42-43.)

Because guard coverage is required twenty-four hours a day, seven days a week at the new facility, the detention officers have to work 12-hour shifts on a rotating schedule. (Chafin Dep. at 29.)  The officers work three days on, three days off, and then two days on, two days off. (Chafin Dep. at 29.)  The neutral rotating schedule requires each detention officer to work two weekends per month, including Saturdays. (Chafin Dep. at 29.)

Despite Sheriff Chafin's knowledge of the Seventh-day Adventist restrictions, which forbade Ashley to work on Saturdays, Ashley was assigned to work on Saturday, March 5, 2005. (Chafin Dep. at 34-35, and 65-66.)  Upon learning of this

3

Saturday shift, Ashley contacted his supervisor, Captain Calvin Troy, and notified him of the conflict between his religious practice and his Saturday assignment. (Ashley Dep. at 66.)   Captain Troy informed Ashley that he was free to swap his Saturday shifts with another employee. (Ashley Dep. at 66.)   The Sheriff Office's general policy was to allow detention officers to swap shifts as long as overtime pay was not required. (Chafin Dep. at 41-42.)

After Ashley's conversation with Captain Troy, Ms. Darlene Wooten, another detention officer at the new facility, volunteered to work Ashley's Saturday shifts if Ashley would take Ms. Wooten's Sunday shifts. (Ashley Dep. at 67.)   Ashley declined Ms. Wooten's offer, however, in order to swap with another detention officer at the facility, Mr. Rocky Rotchford. (Ashley Dep. at 67.)   Ashley explained that he preferred to swap with Rotchford because then Ashley, a male officer, would be replaced by another male officer. (Ashley Dep. at 67-68.)

On February 22, 2005, Ashley and Rotchford visited Captain Troy to discuss the shift swap and to seek approval. (Ashley Dep. at 70.)   Upon learning of their swap proposal, Captain Troy allegedly replied that he was "not going for it" and "ain't nobody going to want to work every Saturday." (Ashley Dep. at 70.)   Afterwards, Ashley volunteered to work every Sunday and Rotchford re-extended their offer to swap again. (Ashley Dep. at 71.)   When the meeting concluded, the swap issue remained unresolved with Captain Troy saying he would have to think about the proposed swap. (Ashley Dep. at 67.)

4

The issue remained unresolved from the meeting on February 22 to the day before Ashley's Saturday shift on March  4.  (Ashley Dep. at 73.)  Ashley states that during that time he never spoke with Captain Troy about the swap, and that he was waiting for Captain Troy to keep his promise and give him a final answer on the matter. (Ashley Dep. at 73.)

On the morning of March 4, the day before he was scheduled to work on Saturday, Ashley learned that Captain Troy denied the swap request. (Ashley Dep. at 74.)  Captain Troy explained to Ashley that he could not swap with Rotchford because Rotchford was going to be transferred back to the position of Outside Detail Officer.[1] (Ashley Dep. at 74.)  Ashley concedes that, because Rotchford was no longer working as a detention officer Rotchford was ineligible to swap schedules with Ashley. (Plaintiff's Statement of Material Facts ("PSMF") ¶ 27.)  Ashley then asked Captain Troy if he had asked anybody else to swap schedules, to which Captain Troy responded that it was not his responsibility. (Ashley Dep. at 75.)   In addition, Captain Troy allegedly said that he had scheduled Ashley to work on Saturday and he expected Ashley to work his shift.  (Ashley Dep. at 75-76.)   After the swap rejection, the delay in rejection notification, and Captain Troy's remarks, Ashley

---

[1] As an Outside Detail Officer, Rotchford was responsible for transporting and supervising inmates while they performed manual labor. (PSMF ¶ 22.) Rotchford had previously served in this capacity, but was transferred to the position of detention officer as punishment for having an affair with a woman while on duty as an Outside Detail Officer.  (PSMF ¶ 23.)

5

claimed he no longer believed that a voluntary swap was possible. (Ashley Dep. at 82-83.)  That same day, March 4, Ashley told Captain Troy that he would not be coming to work the next day, Saturday, March 5. (Ashley Dep. at 77.)

On the morning of March 5, Ashley received a call from a fellow detention officer regarding his Saturday shift, and Ashley stated that he would not be coming to work that day. (Ashley Dep. at 78.)  Captain Troy called approximately half an hour later to tell Ashley not to show up for work on that Sunday either, and that Ashley should meet him in his office on Monday morning. (Ashley Dep. at 78.)

At the meeting on Monday, March 7, Ashley reiterated to Captain Troy and Chief Jerry Miller that he could not work on Saturdays because of his religious beliefs. (Ashley Dep. at 78.)   Captain Troy asked Ashley to sign a letter of resignation. (Ashley at 80.)  After Ashley refused to sign, Captain Troy terminated him. (Ashley Dep. at 80-81.)  Ashley alleges that during this meeting Captain Troy stated that because Ashley could not work on Saturday, he could not use him. (Ashley Dep. at 81.)  The Sheriff's Office did not offer any type of accommodation to Ashley during this meeting. (Ashley Dep. at 80.)

Following his termination, Ashley timely filed a charge with the Equal Employment Opportunity Commission (the "E.E.O.C").  After receiving a right to sue letter on May 20, 2005, Ashley timely filed his complaint on October 18, 2007.

## II.    DISCUSSION

With regard to the issues raised by Defendant, the Court has reviewed the issues and made the following determinations.  First, the Court dismisses the Brooks County Sheriff's Office as a party because it does not have the capacity to be sued.  Second, the Court grants Defendants' Motion for Summary Judgment for the Title VII Disparate Treatment Claim.  Third, the Court denies Defendants' Motion for Summary Judgment for the Title VII Failure to Accommodate Claim after determining that there are genuine issues of material facts.  Fourth, the Court denies Defendants' Section 1983 equal protection claim using the same parallel reasoning as used for the previous issue.  Fifth, the Court grants Defendants' motion to bar any potential Section 1983 monetary damages.

### A. Capacity to be Sued in Application to the Brooks County Sheriff's Office.[2]

The Defendants argue that all claims against the Brooks County Sheriff's Office must be dismissed because the Sheriff's Office is not a proper party under any of Plaintiff's three claims.[3]  The Court agrees.  The issue of whether a

---

[2]  In Plaintiff's Amended Complaint (Doc. 14), Plaintiff agreed to dismiss Sheriff Chafin "in his individual capacity," but to maintain his claim against Sheriff Chafin in his official capacity.  Notwithstanding the granting of this motion, Sheriff Chafin is still subject to suit in his official capacity.

[3]  Plaintiff offered no rebuttal on this specific issue in his Brief in Opposition to Summary Judgment (Doc. 24).

government entity is capable of being sued is "determined by the law of the state in which the district court is held." Fed.R.Civ.Proc. 17(b); accord Lawal v. Fowler, 196 Fed. Appx. 765, 768 (11th Cir. 2006).  In this case, Georgia law controls the issue.  Georgia law recognizes only three classes of legal entities capable of being named in a lawsuit: "(1) natural persons; (2) artificial persons (a corporation); and (3) quasi-artificial persons as the law recognizes as being capable to sue." Lawal, 196 Fed. Appx. 768 (citing Georgia Insurers Insolvency Pool v. Elbert County, 258 Ga. 317, 368 (1988)).  A sheriff's department does not fall into any of the categories and therefore is not capable of being sued. Morgan v. Fulton County Sheriff's Department, 2007 WL 1810217, *6 (N.D. Ga. June 21, 2007)(dismissing claim against Fulton County Sheriff's Department because it was not an entity subject to suit). Therefore, the Brooks County Sheriff's Office is dismissed as a defendant.

### B. Summary Judgment Standard

Federal Rule of Civil Procedure 56(c) requires that the entry of summary judgment is only appropriate when the court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard, the court must examine the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits and other evidence in the record "in the light most favorable to the non-moving party." Everett v. Napper, 833 F.2d 1507, 1510 (11th Cir. 1987).  However, unsupported self-serving statements by the party opposing summary judgment are

8

insufficient to avoid summary judgment. See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984).

If the facts and inferences point overwhelmingly in favor of one party, such that reasonable people could not arrive at a contrary verdict, then the motion was properly granted. Tidwell v. Carter Products, 135 F.3d 1442, 1425 (11th Cir. 1998). Conversely, if there is substantial evidence opposed to the motion such that reasonable people, in the exercise of impartial judgment, might reach differing conclusions, then such a motion was due to be denied and the case was properly submitted to the jury. Id. The non-moving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; "there must be a substantial conflict in evidence to support a jury question." Id.

The moving party bears the initial burden of demonstrating "that there is an absence of evidence to support the non-moving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). When this burden is met, the non-moving party is then required to "go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Id. at 324 (quoting Fed.R. Civ. P.56(e)). This burden requires the non-moving party to come forward with evidence of each essential element of its claim. Hansen v. Perry Techs., 206 F. Supp. 2d 1223, 1225 (S.D. Fla. 2002).

**C. Disparate Treatment Under Title VII**.

Title VII makes it unlawful for an employer "to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).  The term "religion" is defined in the statute as including "all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . [the] employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).   Plaintiff Ashley contends that Defendant discriminated against him on the basis of his religion, and now Plaintiff asserts both a Title VII Disparate Treatment and a Title VII Failure to Accommodate Claim.

The Court will first address the disparate treatment claim found in Count One of the Plaintiff's Complaint (Doc. 1).[4]  Defendant contends that Plaintiff cannot establish a prima facie case of disparate treatment, and the Court agrees.[5]  Where, as here, there is no direct evidence of religious discrimination, Plaintiff must use the evidentiary framework set forth by the Supreme Court to establish a prima facie case through circumstantial evidence. McDonnell Douglas Corp. v. Green, 411 U.S.

---

[4]  From the context of the facts and the complaint, the Court agrees with the Defendant's assumption that Plaintiff's "religious discrimination" claim is a disparate treatment claim.

[5]  The Court also notes that in Plaintiff's Opposition Brief to Summary Judgment (Doc. 24) there is no argument or reference to support his disparate treatment claim.

792, 793 (1973); accord Rojas v. Florida, 285 F.3d 1339, 1342 n. 2 (11th Cir. 2006)(finding that "only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitutes direct evidence of discrimination").

In order to establish a prima facie case of discrimination based upon religion through circumstantial evidence, a plaintiff must establish: (1) he is a member of a protected class, (2) he was qualified for his job, (3) he was subjected to an adverse employment action, and (4) he was replaced by someone outside his protected class or was treated differently than similarly situated employees. Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1087 (11th Cir. 2004); see McDonnell Douglas, 411 U.S. at 802. When the plaintiff establishes a prima facie case, he creates the presumption of discrimination, and the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions. See Rojas, 285 F.3d at 1342. Despite the shifting burden of production between the plaintiff and the defendant under the McDonnell Douglas framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981).

Without any evidence to support his claim, the plaintiff cannot meet his burden to prove a prima facie case. Postell v. Greene County Hosp. Authority, 2007 WL 1876014 *6 (MD. Ga. June 27, 2007)(ruling that "since plaintiff has failed

11

to produce any evidence from which a reasonable jury could conclude that she was treated differently than a similarly situated person outside her protected class, plaintiff cannot make out a prima facie case of religious discrimination").  First, it is undisputed that Ashley, as a Seventh-day Adventist, is a member of a protected class.  Second, considering that Ashley spent nineteen years as a detention officer, and construing the facts in the light most favorable to Ashley, the Court assumes for the purposes of this part of the analysis that Ashley was qualified for his position.  Third, Ashley was terminated from his employment on March 7, 2005 for not working a Saturday shift.  The fourth and only remaining element Ashley must prove to establish a prima facie case is that he was replaced by someone outside his protected group, or was treated differently than similarly situated employees.  Ashley has produced no evidence to show that he was replaced by someone outside of his protected class.  Moreover, Ashley has proffered no evidence that any other similarly situated employees, who are not Seventh-day Adventist, were treated differently after failing to report to work.  Ashley has failed to produce a single valid comparator, therefore Ashley has clearly not met his burden to establish a prima facie case.  Consequently, Sheriff Chafin's Motion for Summary Judgment on Ashley's claim for disparate treatment is granted.

### D.  Failure to Accommodate Under Title VII

The Court will next address the failure to accommodate claim found in Count Two of Plaintiff's Complaint (Doc. 1).  Under Title VII, an employer has an obligation to "reasonably accommodate" an employee's religious observance or practice unless such accommodation would cause "undue hardship" on the conduct of the employer's business.  Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 63 (1986). To establish a prima facie case of failure to accommodate, a plaintiff must demonstrate: (1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer about the belief and the conflict; and (3) he was discharged or disciplined for failing to comply with the conflicting employment requirement.  Beadle v. Hillsborough County's Sheriff's Dept., 29 F.3d 589, 592 n. 5 (11th Cir. 1994)(citing Brener v. Diagnostic Center Hospital, 671 F.2d 141, 144 (5th Cir. 1982)); see also Beadley v. City of Tampa, 42 F.3d 633, 636 (11th Cir. 1995).

Plaintiff Ashley is able to establish a prima facie case on this claim. First, Ashley is a Seventh-day Adventist who believes that work is prohibited on his Sabbath, which is recognized from sunset Friday until sunset Saturday.  Second, Ashley informed his employer about his belief at the beginning of his employment in 1986, and subsequently reminded his supervisor, Captain Troy, in the weeks leading up to the controversy.  Third, there is no dispute that Ashley was fired from

his position on March 7, 2005 for not working on a Saturday.  Thus the Court finds that Ashley has met his initial burden to establish a prima facie case of failure to accommodate.

Once the plaintiff establishes a prima facie case, then the burden shifts to the defendant to show that it offered the plaintiff a reasonable accommodation, or that any accommodation would have imposed an undue hardship on the company's business. Rice, 410 F.Supp.2d 1301, 1309 (N.D. Ga. 2005).  Recognizing that the phrases "reasonable accommodation" and "undue hardship" are not defined under the statutes, each case necessarily depends upon its own facts and circumstances, and in a sense every case boils down to a determination as to whether the employer has acted reasonably. City of Tampa, 42 F.3d at 636.  The Court also takes notice of the Eleventh Circuit maxim that courts should go slow in restructuring an employment practice when the employer's duties involve the protection of lives and property, such as is present in this case.  City of Tampa, 42 F.3d at 637.

### 1. Reasonable Accommodation

In defining "reasonable accommodation," the courts have stated that compliance with Title VII does not require an employer to give an employee a choice among several accommodations. Ansonia Bd. of Educ., 479 U.S. at 68.  The inquiry ends when an employer shows that a single reasonable accommodation was

afforded the employee, regardless of whether that accommodation is one which the employee suggested. Id.

Moreover, "voluntary swaps instituted by employers within the neutral rotating system constitutes reasonable accommodations under Title VII." City of Tampa, 42 F.3d at 637(citing Hillsborough County Sheriff's Dept., 29 F.3d at 593).  To meet this standard of reasonable accommodation, the employer must meet two criteria: (1) a neutral rotating schedule, and (2) an offer to  swap voluntarily (or substitute) schedules. Id.  Plaintiff does not contest that the Sheriff's Office implemented a neutral rotating scheduling system.  However, the voluntary swap is the point of contention between the parties.

The E.E.O.C. has promulgated guidelines to demonstrate how employers can accommodate employees' religious practices. Below are "some of the means of accommodating the conflict between work schedules and religious practices which the commission believes that employers . . . should consider as part of the *obligation* to accommodate:"

> Some means of doing this which employers and labor organizations should consider are: to publicize policies regarding accommodation and voluntary substitution; to promote an atmosphere in which such substitutions are favorably regarded; to provide a central file, bulletin

board or other means for matching voluntary substitutes with positions

for which substitutes are needed.

29 C.F.R. § 1605.2(d)(1); e.g., E.E.O.C. v. Ithaca Industries, Inc., 849 F.2d

116, 119 (4th Cir. 1988)(en banc).

For support of their position, Defendants rely upon Beadle v. Hillsborough

County Sheriff's Department, 29 F.3d 589 (11th Cir. 1994).  In Hillsborough, there

was an employee who requested not to be scheduled to work on Saturdays so he

could recognize his Sabbath as a Seventh-day Adventist. Id. at 590.  The employee

first mentioned his inability to work on Saturday after working with the Sheriff's

Department for over eleven weeks and after completing his training period. Id. at

590-591.  Upon learning of employee's religious practices, the Department granted

him Saturdays off until the Department determined the required legal obligation. Id.

at 591.  The Department later informed the employee that he was free to arrange

voluntary shift swaps, and the Department heavily assisted in this effort. Id.

Specifically, the Department provided the employee with roster sheets and allowed

him to advertise swaps both at roll call and on a Department bulletin board. Id.  The

Department further assisted by allowing the employee to supplement shift swaps

with vacation and sick days, as well as compensation time when he could not

secure a swap as long as the Department could manage it. Id.

The Court in <u>Hillsborough</u> determined that the Department met and exceeded the standard laid out by the E.E.O.C., which boils down to an employer's responsibility to "promote an atmosphere in which such substitutions are favorably regarded." 29 C.F.R. § 1605.2(d)(1).  Thus, when the employee missed one day of work, and on another occasion he walked out during the middle of a shift with no warning, the Department was justified in terminating him. <u>Id</u>. at 593.

In opposition to Defendant's position, Plaintiff relies upon <u>Rice v. U.S.F. Holland</u>, 410 F.Supp.2d 1301 (N.D. Ga. 2005).  In <u>Rice</u>, the employee was a Seventh-day Adventist who also requested that his Sabbath be recognized from sundown Friday to sundown Saturday. <u>Id</u>. at 1304.  The employee approached his employer about his scheduling issue approximately two months in advance of the first possible scheduling conflict. <u>Id</u>. at 1308.  During that initial conversation, the employee claimed that his supervisor said that "he would handle it," and no further action was taken by his employer.  <u>Id</u>. at 1310.  Employee was under the impression that his religious accommodation was going to be honored until he was assigned to work during his Sabbath with only hours of notice. <u>Id</u>. at 1310-1311. Employee refused to work on his Sabbath and was terminated as consequence. <u>Id</u>.

In ruling against the employer, the <u>Rice</u> Court found that the employer "made absolutely no effort to find a solution." <u>Id</u>. at 1310; <u>accord</u> <u>E.E.O.C. v. Ithaca Industries, Inc.</u>, 849 F.2d 116, 118-119 (4th Cir. 1988)(en banc)(finding that "it is clear that the burden is on the employer to offer accommodation," and that employer

violated the plaintiff's rights by making no effort to accommodate the plaintiff with any of the methods suggested by the E.E.O.C.'s guidelines in 29 C.F.R. § 1605.2(d)(1)).  The Court in <u>Rice</u> specifically pointed to a lack of the same factors mentioned in the E.E.O.C.'s 29 C.F.R. § 1605.2(d)(1) and discussed in <u>Hillsborough</u>.  Specifically, the employer in Rice did not offer the plaintiff information or advice about accommodation, did not provide a roster sheet, did not offer a chance for the plaintiff to advertise for swaps, and did not allow the plaintiff to use sick and vacation days. <u>Id</u>.

In the present case, Sheriff Chafin argues that the Sheriff's Office offered voluntary swaps and therefore met the standard for reasonable accommodations. Viewing the facts in a light most favorable to the Plaintiff, the Court disagrees. Ashley claims the Sheriff's Office originally offered voluntary shift swaps, but that after the February 22 meeting where Ashley and Rotchford proposed their shift swap, "the whole attitude had changed . . . it seemed like [the Office was] just not going to allow me to have Saturday off anymore." (Ashley Dep. at 82.)  During that meeting Ashley claims that Captain Troy said he was "not going for it," and that "nobody would want to work every Saturday." (Ashley Dep. at 70-71.)  According to Ashley, the meeting ended with Captain Troy saying that he "would have to think about it," and that he would get back with Ashley about the scheduling conflict. (Ashley Dep. at 71 & 73.)  In the words of Ashley, "I was waiting for [Captain Troy] to get back with me about it." (Ashley Dep. at 73.)  It was not until the morning

18

before his Saturday shift assignment that Ashley learned that the swap had been
denied because Rotchford was going to be transferred.  (Ashley Dep. at 74.)

Captain's Troy's actions do not suggest that the Office was willing to offer
Ashley any accommodation.  If Captain Troy knew that Rotchford was going to be
transferred, or was likely to be transferred, then he should have warned Ashley, or
at a minimum told him immediately after the transfer had been implemented.  If the
Captain did not know about the transfer at the time, then there does not appear to
be a valid reason for him to have discouraged the swap.  Like the plaintiff in Rice,
Ashley would have been in a better position had the employer rejected the swap on
Feburary 22.  Rice, 410 F.Supp.2d at 1311(finding that "oddly enough, a more
*accommodating* response to plaintiff's notification of the schedule-Sabbath conflict
would have been for [the employer] to inform plaintiff that [they were] going to do
nothing to help him or not respond in any way").

In addition, during the March 4 conversation, Ashley alleges Captain Troy
said that he expected Ashley to work his scheduled shifts, including his scheduled
shift on Saturday. (Ashley Dep. 75-76).  At the meeting the following Monday,
Captain Troy asked Plaintiff whether he would be willing to work Saturdays and,
upon Ashley's refusal, he terminated Ashley's employment.  During that meeting
Ashley claims that Captain Troy told him that because Ashley could not work on
Saturday, Captain Troy could not use Ashley. (Ashley Dep. 81).  The Court finds
that Captain Troy's alleged statements and actions, considered along with Ashley's

19

termination, support Ashley's contention that the Office was no longer willing to accommodate his religious practices.[6]

Considering the guidelines provided in 29 C.F.R. § 1605.2(d)(1) and Hillsborough, the Court finds that the Sheriff's Office clearly has not met the required standard. Furthermore, considering the totality of the evidence, it appears that shift swaps were discouraged, which is contrary to the E.E.O.C.'s guideline of

――――――――――――――

[6] Sheriff Chafin collaterally argues that Ashley cannot prevail on his accommodation claim because Ashley did not apply a good faith effort in seeking accommodation. Sheriff Chafin states that Ashley, an employee, "has a duty to make a good faith attempt to accommodate his religious needs through the means offered by employer." (DMSJ at 12-13)(citing Hillsborough, 29 F.3d at 592). Because Ashley failed to mention Ms. Wooten as a swap candidate, Sheriff Chafin argues, Ashley failed to make a good faith effort. As part of his argument, Sheriff Chafin admits that Ashley did not mention Ms. Wooten, because in Ashley's opinion, it would not have made a difference, but dismisses this contention claiming that "Plaintiff has not provided *any* evidence in support." (DMSJ at 13). The Court concludes to the contrary. Considering all the evidence in the light most favorable to the nonmovant, the Court finds sufficient evidence for Ashley to have reasonably believed that it would not have made a difference, therefore justifying why he did not mention other names. See Rice, 410 F.Supp.2d at 1311 (ruling that employee did not compromise his Title VII accommodation claim by not acting when he "reasonably believed" that his actions would not have made a difference).

The Sheriff's Office's failure to communicate with Ashley buttresses the Court's holding. A reasonable observer would expect that if the Office genuinely was willing to allow Ashley to swap shifts, then there should be evidence to show that a supervisor inquired as to whether there was any other possible substitute. Even Sheriff Chafin admits accommodation requires "bilateral cooperation," which necessitates the Office put forth some cooperation and effort. (DMSJ at 13).

"promot[ing] an atmosphere in which such substitutions are favorably regarded." 29 C.F.R. § 1605.2(d)(1).

Reviewing the evidence in the light most favorable to Ashley, despite an earlier position accommodating voluntary swaps, the Sheriff's Office actually discouraged swaps. Not only this, but the Sheriff's Office exacerbated the situation by failing to communicate with Ashley until the day before his Saturday shift. Then, instead of the Office making the minimal effort to inquire whether Ashley knew of any other substitute candidates, Captain Troy threatened to terminate Ashley if he did not work on March 5, making not even the barest attempt to accommodate Ashley.[7]  Perhaps more damningly, at the March 7 meeting, before terminating Ashley, the Office indicated that it was no longer prepared to accommodate Ashley's religious restrictions.  These facts, construed in a light most favorable to Ashley, support the view that the original verbal offer was a sham and that the Office took no legitimate action to accommodate Ashley.  Therefore, this case is similar to Rice and E.E.O.C. in that the employer appears to have "made absolutely no effort" to accommodate Plaintiff.

As in most cases, Defendant's testimony on the controversy is different from Plaintiff's, and in this case Sheriff Chafin has stated that a swap "would have been scrutinized and looked at . . . a lot closer under the new rules and under the new

_____

[7] From the record it is also not entirely clear whether Wooten, or anyone else, was *still* available to swap shifts with Ashley on March 5.

21

facility, but I can't rule out the facts that I would not have done [a shift swap] had [Ashley] found somebody." [Chafin Dep. at 42-43]. Still the Court has not heard any direct testimony from Captain Troy, one of the two principal players in this controversy. At trial, a jury may credit the testimony of Sheriff Chafin and Captain Troy, and thus conclude that the opportunity for a voluntary swap did exist. On summary judgment, however, the Court is not permitted to simply discredit Ashley's testimony as the non-moving party, in favor of Sheriff Chafin's. See Rice, 410 F. Supp.2d at 1311.

Accordingly, the Court finds from the evidence presented that the Office cannot prove that it offered voluntary swaps, or otherwise offered a single accommodation to Ashley.

### 2. Undue Hardship

The Court will next address whether voluntary swaps would have amounted to an "undue hardship" on the Office, which would relieve the Office from meeting any accommodation requirements in this case. The Supreme Court has defined "undue hardship" as "any act that would require an employer to bear greater than a *'de minimis* cost' in accommodating an employee's religious beliefs." Beadle, 29 F.3d at 592 (citing Trans World Airlines, Inc. v. Hardison, 432 U.S. 64, 75 (1977)). The Supreme Court also has recognized that the phrase "*de minimis* cost" entails not only monetary concerns, but also the employer's burden in conducting its business. Trans World Airlines, Inc., 432 U.S. at 75; accord Beadle, 42 F.3d at 636.

22

A refusal to accommodate is justified only when an employer or labor organization can demonstrate that an undue hardship would in fact result from each available alternative method of accommodation. 29 C.F.R. § 1605.2(c)(1).

In City of Tampa, the employee was a new police trainee who desired to have Saturdays off to honor his Sabbath as a Seventh-day Adventist.  City of Tampa, 42 F.3d at 654.  For the city to have made accommodations for the employee, the city would have been forced to assign him to another training squad and not to rotate him during the third phase of training. Id. at 637. The plaintiff admitted that this adjustment would cause him to miss educational benefits from his training. Id.  The Court upheld the city's decision to deny the employee's request, stating that the accommodation would have exceeded a de minimus cost for the employer to conduct his business, which would amount to a undue hardship on the city. Id. at 637-638.

However, those costs found in City of Tampa are absent in the present case. Unlike the trainee in City of Tampa, Ashley would not sacrifice any education benefits after eighteen years of experience on the job.   Nor is there any evidence that if Ashley would have swapped shifts that the administration would have needed to do any material work to record a once-a-week substitution.

Sheriff Chafin also suggests that if Ashley is accommodated, then all employees will begin to swap their schedules, all order will be lost, chaos will

ensue, and public safety will be threatened.  The E.E.O.C. has addressed a similar issue and come to a contrary conclusion: "A mere assumption that many more people, with the same religious practices as the person being accommodated, may also need accommodation is not evidence of undue hardship." 29 C.F.R. § 1605.2(c)(1).  In other words, the assumption that other employees will seek accommodation without any supporting evidence is not a relevant consideration. Without a single piece of evidence in support of the Sheriff's suggestion, the Court cannot consider such a baseless claim.

Moreover, the evidence on record actually suggests that allowing the accommodation would benefit all parties because there are only two long-term detention officers who desire to swap shifts.  Since Ashley desired to recognize his Sabbath on Saturday, but was willing to work every Sunday, this would perfectly compliment Wooten, who wished to recognize her Sabbath on Sunday, but would be willing to work every Saturday.

In sum this Court finds that Sheriff Chafin cannot demonstrate that a voluntary swap for Ashley would have amounted to an undue hardship, therefore  he is not excused from his requirement to offer a reasonable accommodation.

24

**E. Section 1983 Claim**

    1. Prima Facie Case

Ashley claims that the Sheriff's religious discrimination violated his equal protection rights under the Fourteenth Amendment of the Constitution. Ashley brought this action pursuant to 42 U.S.C. § 1983 to enforce these rights because Section 1983 serves as a basis for relief of federal law violations under the color of state law. Whiting v. Jackson State University, 616 F.2d 116, 121 (5th Cir. 1980).[8] "Insofar as it is used as a parallel remedy for transgression of . . . Title VII rights, the elements of the causes of action do not differ." Id. "When section 1983 is used as a parallel remedy for [a] violation . . . to Title VII, the elements of the two causes are the same." Underwood v. Perry County Comm'n, 431 F.3d 788, 793 (11th Cir. 2005)(citing Hardin v. Stynchcomb, 691 F.2d 1364, 1369 n. 16 (11th Cir. 1982)). Consequently, Ashley's Section 1983 claim prevails for the same reason Ashley's Title VII accommodation claim does, because there are genuine issues of material facts that remain unresolved.

    2. Sovereign Immunity against Monetary Awards

The Sheriff's Office claims that when acting as an employer it is covered by sovereign immunity, which bars Ashley from recovering any *possible* Section 1983

---

[8] In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent the decisions of the Fifth Circuit rendered prior to October 1, 1981.

monetary awards.  The Eleventh Amendment provides immunity by restricting the federal courts' judicial power: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI.  The Eleventh Amendment protects a state from being sued in federal court without the state's consent.[9]  Manders v. Lee, 338 F.3d 1304, 1308 (11th Cir. 2003).

To receive Eleventh Amendment immunity, a defendant need not be labeled a "State officer" or "State official," but instead need only be acting as an "arm of the State," which includes agents and instrumentalities of the State. Regents of the Univ. of Cal. v. Doe, 519 U.S. 427, 429-430 (1997).  In other words, the issue is not whether the sheriff acts for the county or state "in some categorical, 'all or nothing' manner;" rather the issue requires attention to the sheriff's role "in a particular area, or on a particular issue."  McMillian v. Monroe County, 520 U.S. 781, 785-786 (1997).

---

[9]  "Although the express language of the [Eleventh] [A]mendment does not bar suits against a state by its own citizens, the Supreme Court has held that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens." Carr v. City of Florence, 916 F.2d 1521, 1524 (11th Cir. 1990)(citing Hans v. Louisiana, 134 U.S. 1(1890)).

The issue of whether an entity is an "arm of the State" for Eleventh Amendment purposes is ultimately a question of federal law. Manders, 338 F.3d. at 1309. But the federal question can be answered only after considering provisions of state law. Id. In Eleventh Amendment cases, the Eleventh Circuit uses four factors to determine whether an entity is an "arm of the State" in carrying out a particular function: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for covering judgments against the entity. Id. at 1319; see also Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm., 226 F.3d 1226, 1231-34 (11th Cir. 2000).

In applying the first factor to this case, the Court finds that the Brooks County Sheriff's Office is a State body.[10] In Manders, the court reviewed Georgia law and

---

[10] Georgia's Constitution grants the State legislature the exclusive authority to establish and to control a sheriff's powers and duties. Ga. Const. art IX § 1, ¶3(a)-(b). The sheriff's office is a separate constitutional office independent from the County and its governing body. See Ga Const. art IX. § 2, ¶1(c)(1); see also Manders, 338 F.3d at 1310. The sheriff is an elected, constitutional officer; he is subject to the charge of the General Assembly and is not an employee of the county commission. See Chafin v. Calhoun, 262 Ga. 202 (1992); see also Manders, 338 F.3d at 1310.

determined that the "sheriff's obligation to administer the jail [is] directly derived from the State and not delegated through the county entity." Id.   This Court concludes that the requirement to "administer" the jail would certainly include employment and staffing decisions.

Applying the second factor, this Court finds that the State maintains a majority of control over the Sheriff's Office. See Id. at 1322 (finding that "because of the State's direct and substantial control over the sheriff's duties, training, and discipline and the county's total lack thereof, this control factor also weighs heavily in favor of [the sheriff being] entitle[d] to Eleventh Amendment immunity").

Applying the third factor, the Court finds that, while the Sheriff's Office collects a majority of its funding from Brooks County, this does not allow Brooks County any control over the Sheriff's Office. Id. at 1323-1324.  Indeed, the Georgia Constitution prevents Brooks County from taking any action affecting the Sheriff's Office or its personnel. Id.  Additionally, the state does provide some funding for the Sheriff's Office. Id. at 1323.  For instance, the state provides funding for the annual training of sheriffs, for the Governor's disciplinary procedure over sheriffs' use of excessive force, and for the housing of some state prisoners in county facilities under the sheriff's supervision. Id.  The court in Manders held that, despite the fact that a majority of the funding came from the county, because of the total control of the state over the over the sheriff's office and the fact that the state does provide

28

some funds, the "state involvement is sufficient to tilt the third factor of the Eleventh Amendment toward immunity." Id. at 1324.

Applying the fourth factor is more problematic than applying the other three factors.  First, "Georgia courts speak with unanimity in concluding that a defendant county cannot be held liable for the tortious actions or misconduct of the sheriff or his deputies and is not required to pay resulting judgments."  Id. at 1326. Furthermore, Georgia courts have held that counties are not liable, and are not required to give sheriffs money to pay, judgments against sheriffs in civil rights cases.  Id.  Additionally, the Georgia Supreme Court held that the county has no duty to furnish a sheriff with money to settle a civil rights judgment entered against him.  Id. at 1326-27.  However, the Manders court could "locate no Georgia law expressly requiring the state to pay an adverse judgment against [a sheriff] in his official capacity."  Id.  at 1327.  The Manders court reasoned that if any party takes an adverse judgment against the Sheriff's Office, any funds used to pay the judgment would come from the Sheriff's Office's general budget.  See Id. at 1326-1328.   Despite the fact that the state would not be liable for a judgment entered against a sheriff in his official capacity, the Manders court held that Eleventh Amendment analysis "is not limited to who foots the bill, and, at a minimum, the liability-for-adverse-judgment factor does not prevent [a sheriff's] immunity claim." Id. at 1328.

This Court finds that all four factors weigh in favor of finding Sheriff Chafin is an arm of the State in relation to making employment decisions for the Sheriff Office.[11]   Therefore, the Brooks County Sheriff's Office is entitled to sovereign immunity from any Section 1983 monetary award for the purposes of this case.

## III.   CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss the Brooks County Sheriff's Office from all claims is granted; Defendant's Motion for Summary Judgment on Title VII Disparate Treatment Claim is granted; Defendant's Motion for Summary Judgment for Title VII Failure to Accommodate Claim and Section 1983 equal protection claim are denied; Defendant's motion to bar Section 1983 monetary damages is granted.

**SO ORDERED**, this the 23rd day of September, 2009.

/s/ Hugh Lawson
**HUGH LAWSON, Senior Judge**

bgb

---

[11] This Court notes that <u>Manders</u> only considered the narrow function of "establishing use-of-force policy at the jail," and the Eleventh Circuit explicitly declined to decide whether county sheriffs are arms of the State for any of their other specific duties.  <u>Manders</u>, 338 F.3d at 1319.